J-S65002-17 & S65003-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.A.T., A MINOR A/K/A K.T. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.T., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1302 EDA 2017 |

Appeal from the Order Entered March 20, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000173-2017,
CP-51-DP-0001051-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: K.A.T., A MINOR A/K/A K.T. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1502 EDA 2017 |

Appeal from the Order Entered March 20, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000173-2017,
CP-51-DP-0001051-2015

BEFORE:  OLSON, J., OTT, J., and MUSMANNO, J.

MEMORANDUM BY OLSON, J.:                    **FILED OCTOBER 31, 2017**

A.T. ("Father") and E.B. ("Mother") appeal from the decrees and order

dated and entered on March 20, 2017, granting the petitions filed by the Child

Advocate, Attorney Carla Beggin, on behalf of the male, dependent child,

K.A.T. a/k/a K.T. ("Child") (born in January of 2015), to involuntarily terminate their parental rights to Child, pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), and change Child's permanency goal to adoption pursuant to the Juvenile Act, 42 Pa.C.S. § 6351.[1]  Mother's counsel, Attorney Michael J. Graves ("Mother's Counsel"), has filed with this Court a motion for leave to withdraw as counsel and a brief pursuant to **Anders v. California**, 386 U.S. 738, 744 (1967).  We affirm, and grant Mother's Counsel leave to withdraw.

In its opinion entered on May 19, 2017, the trial court set forth the factual background of this appeal, as follows.

> The family in this case became known to DHS [Philadelphia Department of Human Services ("DHS" or the "Agency")] on January 8, 2015, when DHS received a General Protective Services ("GPS") report which alleged that on January 2, 2015, and January 3, 2015, Mother tested positive for cocaine, methadone, and benzodiazepines; that on January 2, 2015, Mother was admitted to Thomas Jefferson University Hospital ("TJUH" [or "Jefferson"]); that Mother admitted to recently using cocaine; that on January [ ], 2015, Mother gave birth to Child. The report also alleged that Mother was prescribed methadone through the Narcotic Addiction Rehabilitation Program ("NARP") and benzodiazepines for mental health issues; that Child was born prematurely at twenty-six weeks' gestation; that Child weighed one pound and fifteen ounces at birth; that Child was being monitored in the neonatal intensive care unit ("NICU"); and that Mother was scheduled to be discharged from the hospital on January 8, 2015.  The report further alleged that Child had two

_____

[1] In a separate decree dated and entered on March 20, 2017, the trial court terminated the parental rights of any unknown father of Child.  No unknown father has filed an appeal, nor is any such individual a party to the present appeal.

older siblings, an eight-year-old ("Sibling 1") and a one-year-old ("Sibling 2"); that Sibling 1 lived in kinship care with the maternal grandmother ("MGM") and Sibling 2 lived with Mother and Father; that Mother and Father lived together in the home of the paternal grandparents; that Mother was unemployed; that Father may be employed; that Mother and Father were both receiving methadone maintenance; and that Mother was diagnosed with anxiety, depression, and bipolar disorder. The report was found to be valid.

On April 1, 2015, DHS received a GPS report that Child was gaining weight at the hospital and was scheduled to be discharged; that now Mother and Father live in a shelter; and that Mother and Father were still receiving methadone maintenance for drug addictions. The report also alleged that Mother receives mental health treatment through CATCH [Citizens Acting Together Can Help] and last had an appointment scheduled in February 2015, which she cancelled; and that CATCH prescribed Mother medication to treat her symptoms. DHS requested that Mother go to the Clinical Evaluation Unit ("CEU") to submit for a random drug screen, but Mother refused, claiming she had conflicting appointments scheduled for that day. Mother and Father denied being under the influence of drugs and claimed that they were just tired from their hectic daily schedule.

On April 8, 2015, DHS learned that Child was ready for discharge from TJUH; however, DHS and the Community Umbrella Agency ("CUA") Wordsworth were unable to locate an appropriate medical foster home for Child. Mother and Father provided DHS with the names of their Pastor and his wife ("foster parents"). The foster parents successfully completed the necessary medical training necessary to appropriately care for Child. After April 8, 2015, while still at TJUH, Child had four separate breathing episodes and was not feeding well. On April 23, 2015, Child was discharged from TJUH. That same day, DHS obtained an Order for Protective Custody ("OPC") for Child and he was placed with the foster parents through CUA-Wordsworth. A shelter care hearing was held on April 24, 2015, at which the OPC was lifted and the temporary commitment to DHS was ordered to stand. The CUA social worker testified that Father was not ready, willing, or able to take custody of the Child upon discharge. (N.T. 3/20/17, pgs. 6-7).

Sibling 1 is committed to DHS with a goal of Permanent Legal Custody ("PLC") and lives in the home of the maternal grandparents. At Sibling 1's dependency hearing on March 25, 2015, the [c]ourt referred Mother to the CEU for a forthwith drug screen, three random drug screens, a dual diagnosis assessment, and monitoring and she was to be referred to the Achieving Reunification Center ("ARC") for parenting. Mother went to the CEU and tested positive for high levels of benzodiazepines and methadone; there were also traces of cocaine, phencyclidine and opiates present in her urine. At a permanency review hearing on November 18, 2015, the [c]ourt found aggravated circumstances against Father pursuant to 42 Pa.C.S.A. §6302(3)(ii). Father was convicted on June 9, 1998, for statutory sexual assault and corrupting a minor.

On May 19, 2015, Child was adjudicated dependent and fully committed to DHS custody. The [c]ourt ordered Mother and Father to have supervised visits twice weekly; Mother and Father were ordered to go to the CEU for dual diagnosis and random drug screens; and Mother and Father were to attend ARC for parenting, housing, and employment.

At a permanency review hearing on November 18, 2015, the [c]ourt ordered both Mother and Father back to the CEU for dual diagnosis and random drug screens and monitoring. Mother and Father were also referred to ARC, and visits were changed to supervised at the agency only. At a permanency review on February 17, 2016, Mother's drug screens from November 18, 2015, January 15, 2016, and February 11, 2016, were entered into evidence. Mother had tested positive with high levels of amphetamines on the January and February drug screens. Father's drug screens for November 18, 2015, December 2, 2015, and February 10, 2016, were also entered into evidence. Father had tested positive for high levels of benzodiazepines on all drug screens and positive for amphetamines on the February drug screen. The CEU could not confirm any treatment for Father. It was testified that Mother and Father smell like smoke around Child at visits. The Child Advocate entered into evidence a letter from Child's doctor indicating the harmful effects on [] Child when he is around cigarette smoke and the odor of smoke. At a permanency hearing on May 18, 2016, the [c]ourt ordered that Mother and Father have supervised visits twice each week at the agency; that Mother and Father confirm twenty-four hours in advance, and on the day of the visit; and if Mother or Father is late more than two

times, visits are to be modified to once each week. The [c]ourt also ordered that Mother and Father sign consents for Child to receive tubes in his ears; and that a prior court order that there be no contact between the foster parents and Mother and Father stand. Mother and Father had missed eight visits with Child since the prior court date. Mother was referred to the CEU for a forthwith drug screen, five random drug screens before the next court date, and dual diagnosis. Father was referred to the CEU for a forthwith drug screen, monitoring, and three randoms prior to the next court date. At an August 10, 2016, permanency review, the [c]ourt ordered that Mother and Father have weekly supervised visits at the agency with Child for two hours on Mondays; that Mother and Father provide twenty-four hours' and day of notice for the visit; that if Mother and Father are fifteen minutes late, the visit is cancelled; that MGM is permitted to have thirty minutes to an hour of visitation with Child before Mother and Father's visit; and that if MGM acts out of hand two times, her visits are suspended. The [c]ourt also ordered Mother to the CEU for a forthwith drug screen, three random screens, dual diagnosis assessment, and monitoring; that Mother sign all appropriate releases; that CUA follow up with Jefferson in regards to Mother's treatment; that Father go to the Behavioral Health System ("BHS") for a forthwith consultation and evaluation. At a November 19, 2016, permanency review, the [c]ourt ordered Mother and Father to the CEU for assessment, forthwith drug screen, and three random drug screens prior to the next court date; Mother and Father to comply with all Single Case Plan ("SCP") objectives and recommendations, and attend all of Child's medical appointments.

Trial Court Opinion, 5/19/17, at 1-4.

On February 15, 2017, the Child Advocate filed the termination and goal change petitions. The trial court held a hearing on the petitions on March 20, 2017. The trial court found the following from the testimony at the hearing.

At the time, Child was two years of age and had spent twenty-three months in care. Neither Mother nor Father were [sic] present for the termination trial. Both Father and Mother were properly served. Prior to taking testimony, the [c]ourt noted that Mother and Father were served with the petitions and the court date by regular mail and overnight mail, which was delivered

on March 10, 2017, to their last known address as per the Parent Locator Search ran [sic] by DHS in February 2017. The [c]ourt found that reasonable efforts for good faith service on Father and Mother were made by the Child Advocate at their last known address. The [c]ourt also noted that Mother has an outstanding bench warrant for failure to appear on November 24, 2016, in another court [*i.e.*, not Family Court, N.T., 3/20/17, at 5]. After agreement by all parties, the [c]ourt accepted a stipulation as to the facts alleged in the petition, but not to the veracity. (N.T. 3/20/17, pgs. 4-6).

Father has been minimally compliant with his SCP objectives. CUA testified that Father's SCP objectives were to comply with CEU random drug screens; to attend Jefferson for a drug and alcohol methadone maintenance program; to obtain stable housing; to obtain employment; to complete a court ordered Parenting Capacity Evaluation; to attend parenting classes; and to comply with visitation. Father was aware of his SCP objectives. (N.T. 3/20/17, pgs. 12-13, 15). CUA testified that Father was called for random drug screens, but he did not attend any of them. CUA testified that Father was attending Jefferson for methadone maintenance as of February 2017, but it could not be verified if Father is still currently attending. Father was last enrolled at Moss Rehab for mental health treatment. CUA testified that she last received information regarding Father's enrollment at Moss Rehab in February 2017. CUA has not received anything more recent and Father did not provide any documentation when asked. (N.T. 3/20/17, pgs. 13-15). Father does not have appropriate housing. Father is pending eviction from the home where he currently resides. Father lives with Mother. Father was referred to ARC for an employment workshop. Father is not currently employed. Father completed a Parenting Capacity Evaluation. Father did attend parenting classes. (N.T. 3/20/17, pgs. 12-14). Father did not attend any of Child's medical appointments since the last court date as court ordered. Father did not attend any visits with Child since the last court date. Father had a visitation schedule sent to him. (N.T. 3/20/17, pg. 14-15).

Mother has also been minimally compliant with her SCP objectives. CUA testified that Mother's SCP objectives were to comply with the CEU for dual diagnosis; to attend random drug screens; to continue drug and alcohol treatment at Jefferson; to obtain stable housing; to complete the second portion of Parenting Capacity Evaluation; to attend parenting classes; to obtain

employment; and to comply with visitation. (N.T. 3/20/17, pgs. 7, 9, 12). Mother was aware of her objectives. During monthly meetings between CUA and Mother, CUA testified that SCP objectives are discussed, and Mother participated in conferences with CUA and DHS. (N.T. 3/20/17, pgs. 10-11).

CUA testified that she called Mother for three separate random CEU drug screens since the last court date, but Mother did not attend any of them. CUA testified that Mother is attending Jefferson's drug and alcohol and methadone maintenance program. Jefferson reported that Mother receives random drug screens, but Jefferson is not able to release the results to CUA. Mother has not provided CUA with any documentation regarding her drug screens. At the last court date on November 19, 2016, there was a concern about Mother's drug levels and the [c]ourt ordered that Mother contact her provider to get a letter explaining why her drug levels are so up and down on her drug screens. Mother did not comply with the court order. CUA testified that Mother was referred to the CEU to be enrolled in an effective drug and alcohol treatment program. Mother was previously enrolled at CATCH for mental health treatment, but CUA testified that Mother was inconsistent with her attendance. CUA was unable to verify whether Mother is still currently attending CATCH. (N.T. 3/20/17, pgs. 7-9, 18). Mother does not have appropriate housing. Mother is pending eviction in the home where she currently resides with Father. Mother does not have employment, and she was referred to ARC for employment resources. Mother only completed the first part of a Parenting Capacity Evaluation, and has yet to complete the second part. Mother did complete parenting classes. (N.T. 3/20/17, pgs. 9-10). Mother has not attended any of Child's medical appointments as ordered by the court. Mother was granted biweekly supervised visits with the Child on Mondays. Since the last court date, three visits were offered to Mother. Mother did not attend any visits. Mother had a visitation schedule sent to her. Mother had the current contact information for CUA, who has been on this case since August 2016. Mother did not contact CUA with any reasons for missing visits. (N.T. 3/20/17, pgs. 11, 17-18).

Child is currently placed in kinship care through Delta. CUA testified that Child is doing very well in kinship care. Child is medically needy. CASA testified that Child is receiving ongoing speech and swallowing therapy on a weekly basis, as well as in-home occupational therapy through Early Intervention. Child also

has a series of ongoing chronic medical issues that are addressed as needed. The kinship care foster parents have been meeting all of Child's needs and Child is thriving. CUA testified that Child would suffer irreparable harm if removed from the kinship home. (N.T. 3/20/17, pgs. 16-17, 19).

At the time of the termination trial, neither Father nor Mother had successfully completed drug and alcohol treatment or complied with CEU random drug screens. Mother did not complete her mental health objective. Father and Mother live together and do not have stable housing. They are pending eviction. Neither Father nor Mother are [sic] employed. Mother only completed the first part of her Parenting Capacity Evaluation, and still must complete the second part. Neither Father nor Mother attended Child's medical appointments or visits since the last court date. Father and Mother were only minimally compliant with their SCP objectives. Neither Father nor Mother is able to take custody of Child. The [c]ourt found clear and convincing evidence that changing the permanency goal to adoption and involuntarily terminating Father's and Mother's parental rights were in Child's best interests. The [c]ourt also found that Child would not suffer irreparable harm if Father's and Mother's parental rights were terminated.

Trial Court Opinion, 5/19/17, at 4-6.[2]

On March 20, 2017, the trial court entered the decrees and order that

terminated Father's and Mother's parental rights to Child under 23 Pa.C.S.

---

[2] We note that the Child Advocate filed the termination and goal change petitions and presented testimony regarding service of the petitions on the parents. Counsel for DHS presented the testimony of the DHS social worker, Kennisha White. Counsel for Mother cross-examined Ms. White. Counsel for Father had no questions for Ms. White, nor did the Child Advocate. The trial court then questioned the Court-Appointed Special Advocate, Jennifer Lott. Counsel for DHS also questioned Ms. White concerning any unknown father of Child. Neither counsel for Mother nor counsel for Father, nor the Child Advocate had any questions on cross-examination regarding any unknown father.

§2511(a)(1), (2), (5), (8), and (b), and changed the permanency goal to adoption pursuant to 42 Pa.C.S. § 6351. On April 18, 2017, and April 19, 2017, Father and Mother, respectively, filed the notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[3] On June 21, 2017, Mother's counsel filed a motion to withdraw as counsel and an *Anders* brief on behalf of Mother. On July 31, 2017, Mother's counsel filed a second motion to withdraw as counsel and a revised *Anders* brief on behalf of Mother. In Father's brief, Father's counsel states that he decided not to file an *Anders* brief because he could not conclude that Father's appeal would be "wholly frivolous." Father's Brief, at ix.

In the *Anders* brief, Mother's counsel raises the following issues:

IN ACCORDANCE WITH ANDERS V. CALIFORNIA, IS THERE ANYTHING IN THE RECORD THAT MIGHT ARGUABLY SUPPORT THE APPEAL THAT UPON INDEPENDENT REVIEW OF THE RECORD THE COURT SHOULD CONCLUDE THAT THE APPEA[L] IS NOT WHOLLY FRIVOLOUS?

WHETHER THERE WAS A LEGAL BASIS FOR TERMINATING MOTHER'S PARENTAL RIGHTS PURSUANT TO 23 Pa.C.S.A. [§] 2511(a)(1), (a)(2), (a)(5), (a)(8) AND (b) AS MOTHER WAS MODERATELY COMPLIANT WITH OBJECTIVES WHILE THE GOAL WAS REUNIFICATION[?]

---

[3] This Court listed the appeals consecutively for disposition, but we will address them in the same memorandum decision, as did the trial court, for ease of disposition.

Mother's **Anders** Brief, at 7.[4]

In his brief, Father raises the following issues:

1. Did the Trial Court err when it found that the Department of Human Services by clear and convincing evidence had met its burden to terminate Appellant's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), § 2511(a)(2), § 2511(a)(5), and § 2511(a)(8)?

2. Did the Trial Court err when it found that the termination of father's parental rights was in the child's best interests and that the Department of Human Services had met its burden pursuant to 23 Pa. C.S.A. §2511(b)?

3. Did the Trial Court err in changing the permanent placement goal from reunification to adoption?

Father's Brief, at vi.

Pursuant to **Anders**, when counsel believes an appeal is frivolous and wishes to withdraw representation, he or she must do the following:

(1) petition the court for leave to withdraw stating that after making a conscientious examination of the record . . ., counsel has determined the appeal would be frivolous;

(2) file a brief referring to anything that might arguably support the appeal. . .; and

(3) furnish a copy of the brief to defendant and advise him of his right to retain new counsel, proceed **pro se**, or raise any additional points he deems worthy of the court's attention.

---

[4] Mother has waived any challenge to the change in the Children's permanency goal to adoption under 42 Pa.C.S. § 6351 by failing to raise the issue in her concise statement and Statement of Questions Involved in her brief. **See Krebs v. United Refining Company of Pennsylvania**, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an appellant waives issues that are not raised in both his concise statement of errors complained of on appeal and the Statement of Questions Involved in his brief on appeal).

*In re S.M.B.*, 856 A.2d 1235, 1237 (Pa. Super. 2004) (citation omitted).

In *In re V.E.*, 611 A.2d 1267, 1274-75 (Pa. Super. 1992), this Court extended the *Anders* principles to appeals involving the termination of parental rights. "When considering an *Anders* brief, this Court may not review the merits of the underlying issues until we address counsel's request to withdraw." *In re S.M.B.*, 856 A.2d at 1237.

In *Commonwealth v. Santiago*, 602 Pa. 159, 978 A.2d 349 (2009), our Supreme Court addressed the second requirement of *Anders*, *i.e.*, the contents of an *Anders* brief, and required that the brief:

(1) provide a summary of the procedural history and facts, with citations to the record;

(2) refer to anything in the record that counsel believes arguably supports the appeal;

(3) set forth counsel's conclusion that the appeal is frivolous; and

(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, 602 Pa. at 178-79, 978 A.2d at 361. "After an appellate court receives an *Anders* brief and is satisfied that counsel has complied with the aforementioned requirements, the Court then must undertake an independent examination of the record to determine whether the appeal is wholly frivolous." *In re S.M.B.*, 856 A.2d at 1237.

With respect to the third requirement of **Anders**, that counsel inform the defendant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." **Commonwealth v. Millisock**, 873 A.2d 748, 752 (Pa. Super. 2005).

Here, in his motion for leave to withdraw, Mother's Counsel has complied with each of the requirements of **Anders**. Mother's Counsel indicates that he conscientiously examined the record and determined that an appeal would be frivolous. Further, Mother's Counsel's **Anders** brief comports with the requirements set forth by the Supreme Court of Pennsylvania in **Santiago**. Finally, attached to his motion for leave to withdraw is a copy of his letter to Mother, dated July 31, 2017. In compliance with **Millisock**, the letter advised Mother of her right to proceed *pro se* or retain alternate counsel, and stated counsel's intention to seek permission to withdraw. Accordingly, Mother's Counsel has complied with the procedural requirements for withdrawing from representation, and we will proceed with our own independent review.[5]

---

[5] This Court has stated, "[o]nce counsel has satisfied the above requirements [for a motion to withdraw and **Anders** brief], it is then this Court's duty to conduct its own review of the trial court's proceedings and render an independent judgment as to whether the appeal is, in fact, wholly frivolous." **Commonwealth v. Goodwin**, 928 A.2d 287, 291 (Pa. Super. 2007) (*en banc*) (quoting **Commonwealth v. Wright**, 846 A.2d 730, 736 (Pa. Super. 2004)). **See Commonwealth v. Flowers**, 113 A.3d 1246, 1250 (Pa. Super. 2015) (following **Goodwin**). Thus, we address whether the Child Advocate established the grounds for termination.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, [614 Pa. 275, 284,] 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 613 Pa. 371[, 455], 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, [575 Pa. 647, 654-655], 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, [608 Pa. at 28-30], 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, [539 Pa. 161, 165,] 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.*, 616 Pa. 309, 325-26, 47 A.3d 817, 826-27 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained:

> [t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (*quoting In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

In the *Anders* brief, Mother's Counsel contends that the trial court abused its discretion or erred as a matter of law in concluding that the Child Advocate presented clear and convincing evidence that was sufficient to support the involuntary termination of his parental rights under section 2511(a)(1), (2), (5), (8), and (b). Mother's *Anders* Brief, at 16. In his brief, Father likewise contends that there was insufficient evidence to support the termination of his parental rights, and to support the change of the permanency goal to adoption.

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We confine our analysis to subsection (2) of section 2511(a). Section 2511(a)(2) and (b) provides, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

The Supreme Court set forth our inquiry under section 2511(a)(2) as follows.

As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .

This Court has addressed incapacity sufficient for termination under § 2511(a)(2):

> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.
>
> *In re Adoption of J.J.*, [511 Pa. 599, 605,] 515 A.2d 883, 891 (Pa. 1986) (*quoting In re: William L.*, [477 Pa. 322, 345,] 383 A.2d 1228, 1239 (Pa. 1978).

*In re Adoption of S.P.*, 616 Pa. at 326-327, 47 A.3d at 827.

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

The trial court addressed Mother's and Father's sufficiency issues as follows.

> Child was taken into DHS custody because Father and Mother were unable to provide essential parental care: Father and Mother had substance abuse problems; Father and Mother were unable to provide stable housing; Mother was in need of mental health treatment; and Mother tested positive for cocaine, benzodiazepines, and methadone at the time of Child's birth. Father and Mother were unable to remedy the causes of their repeated and continued incapacity to provide Child with essential parental care, control, or subsistence necessary for Child's physical and mental well-being. Father did not successfully complete his SCP objectives. Father did not comply with his court ordered random drug screens at the CEU, though CUA testified that he was called. As of February 2017, Father was still attending a drug and alcohol program with methadone maintenance at

- 16 -

Jefferson. Father has not successfully completed his drug and alcohol objective. Father did not complete his mental health objective, either, as he was enrolled at Moss Rehab as of February 2017. CUA has been unable to verify that Father is still attending at the time of the termination trial, and Father has not provided any progress reports or treatment plan. Father, who lives with Mother, does not have appropriate housing, and is pending eviction at his current home. Father was referred to ARC for an employment workshop, but Father is currently unemployed. Father did, however, successfully complete his parenting classes and the Parenting Capacity Evaluation. Father did not comply with the [c]ourt's order to attend Child's medical appointments. Child is a very medically needy child and has chronic medical issues. At the permanency hearing in November 2016, Father had missed four out of seven medical appointments, and Father did not attend any medical appointments since that hearing. Father has not visited with Child since the November 2016 hearing. (N.T. 3/20/17, pgs. 12-15).

Mother was minimally compliant with her SCP objectives as well. Mother did not comply with her court ordered random drug screens at the CEU, though CUA testified that she called Mother to attend. Mother was also ordered to provide a letter from her drug and alcohol program explaining the highs and lows of her drug screen results; Mother never provided such a letter. Mother did not complete her drug and alcohol objective as she is still attending Jefferson's drug and alcohol and methadone maintenance program. CUA is unable to obtain Mother's drug screen results from Jefferson and Mother has not provided any documents, either. Mother was inconsistent in her mental health treatment at CATCH and CUA was unable to verify whether Mother was still attending. (N.T. 3/20/17, pgs. 7-9, 18). Mother does not have appropriate housing, as she lives with Father, and is pending eviction from her last known residence. Mother was referred to ARC for employment services, but is presently unemployed and has not completed the ARC employment workshop. Mother did not complete the full Parenting Capacity Evaluation; she has to complete the second part. Mother did, however, complete parenting classes. (N.T.. 3/20/17, pgs. 9-10). At the November 2016 permanency hearing, Mother was ordered to attend Child's medical appointments and had already missed four out of seven of Child's medical appointments. Mother did not attend any of Child's medical appointments since the November 2016 review hearing. Mother did not attend any visits with Child

since that November 2016 review hearing, either. Father and Mother failed to take affirmative steps to place themselves in positions to parent Child. Father and Mother are unable to remedy the causes of their incapacities to meet Child's safety and medical needs. Child needs permanency, which Father and Mother cannot provide. Child is a medically needy child with chronic medical issues. Neither Father nor Mother is able to take immediate custody of Child.

Trial Court Opinion, 5/19/17, at 9-11.

After a careful review of the record, we find that termination of Mother's and Father's parental rights to Child was warranted pursuant to section 2511(a)(2), as Mother and Father clearly lack parental capacity, and the evidence showed that they will be unable to remedy that situation within a reasonable period of time, if ever. As there is competent evidence in the record that supports the trial court's findings and credibility determinations, we would find no abuse of the trial court's discretion in terminating Mother's and Father's parental rights to Child under section 2511(a)(2). *In re Adoption of S.P.*, 616 Pa. at 325-326, 47 A.3d at 826-827.

Next, this Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *See In re Adoption of C.L.G.*, 956 A.2d 999, 1008 (Pa. Super 2008) (*en banc*). In reviewing the evidence in support of termination under section 2511(b), our Supreme Court as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include

- 18 -

"[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [533 Pa. 115, 121, 620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 620 Pa. 602, 628-629, 71 A.3d 251, 267 (Pa. 2013).

With regard to section 2511(b), the trial court stated the following:

Father has not visited with the Child since the last court date in November 2016. Father has not attended Child's medical appointments since that court date, either. (N.T. 3/20/17, pgs. 14-15). Similarly, Mother has not visited Child since the last November 2016 review hearing, nor has she attended any of his medical appointments. (N.T. 3/20/17, pgs. 11, 17-18). CUA testified that Child would not suffer any irreparable harm if Father's and Mother's rights were terminated. Child does not have a healthy, positive paternal bond with Father. Child does not have a healthy, positive maternal bond with Mother. Child is currently placed with the kinship foster parents who have cared for him since entering care, as soon as he was discharged from the hospital's NICU. The kinship parents are the only parents Child knows. Child is medically needy. Child receives ongoing speech therapy and swallowing therapy each week. Child also receives in–home occupational therapy through Early Intervention. The kinship foster parents meet all of Child's needs. Child is thriving in the kinship home. CUA testified that Child would suffer irreparable harm if removed from the kinship home. (N.T. 3/20/17, pgs. 15-17, 19). Child is in a safe home. The DHS witness was credible. Consequently, the trial court did not abuse its discretion when it found, by clear and convincing evidence, that there was no parental bond between Father and Child or Mother and Child and that termination of Father's and Mother's parental rights would not destroy any existing beneficial relationship.

Father and Mother also allege that the court erred in changing Child's permanency goal from reunification to adoption. In a change of goal proceeding, the child's best interest must be the focus of the trial court's determination. The child's safety and health are paramount considerations. *In re A.H.*, 763 A.2d 873

(Pa. Super. 2000). Pennsylvania's Juvenile Act recognizes family preservation as one of its primary purposes. ***In the Interest of R.P. a Minor***, 957 A.2d 1205 (Pa. Super. 2008). As a result, welfare agencies must make efforts to reunify the biological parents with their child. Nonetheless, if those efforts fail, the agency must redirect its efforts toward placing the child in an adoptive home. Agencies are not required to provide services indefinitely when a parent is unwilling or unable to apply instructions received. ***In re R.T.***, 778 A.2d 670 (Pa. Super. 2001). The trial court should consider the best interest of the child as it exists presently, rather than the facts at the time of the original petition.

Neither Father nor Mother is currently ready or able to parent Child. At the time of the termination trial, neither Father nor Mother had successfully completed all of their SCP objectives. Father did not attend any of his court ordered random drug screens since the last court review hearing in November 2016. As of February 2017, Father was still attending Jefferson and Moss Rehab for methadone maintenance and mental health treatment, respectively. Father has not completed his drug and alcohol and mental health objectives. Father has tested at very high levels for benzodiazepines and amphetamines as per exhibits in the record. Father does not have appropriate housing and is pending eviction from his current residence. Father was referred to ARC for an employment workshop, but did not attend. Father remains unemployed. Father did, however, complete a Parenting Capacity Evaluation and parenting classes. Since the November 2016 review hearing, Father has not attended any of Child's medical appointments as court ordered, nor has he visited with [] Child. (N.T. 3/20/17, pgs. 12-15). Child is medically needy with many chronic medical issues. Mother also has not attended any of her court ordered random drug screens at the CEU. Mother did not provide a letter from her drug and alcohol program regarding the extreme fluctuations in her drug screens' substance level as court ordered. Mother has tested at very high levels for amphetamines as per the exhibits in the record. Mother did not complete her drug and alcohol objective as she is still attending Jefferson for a methadone maintenance program and has not attended the CEU for a dual diagnosis assessment. Mother was inconsistent with her attendance for mental health treatment at CATCH[,] and CUA was unable to verify whether Mother was still attending or her treatment progress. (N.T. 3/20/17, pgs. 7-9, 18). Mother lives with Father and is also facing eviction from her current home, so

she does not have stable housing. Mother was referred to ARC for an employment workshop, but she did not attend. Mother remains unemployed. Mother did not complete the Parenting Capacity Evaluation as she still has to complete the second part. Mother did, however, complete parenting classes. (N.T. 3/20/17, pgs. 9-10). Mother has not attended Child's medical appointments as court ordered since the last review hearing in November 2016. Mother has not visited with Child since that last November 2016 court review hearing. (N.T. 3/20/17, pgs. 11, 17-18). Child has been in a safe and permanent home for almost two years. The trial court heard testimony that adoption is in Child's best interests. (N.T. 3/20/17, pg. 17). Child needs permanency, which Father and Mother cannot provide at this time. The DHS witness was credible. The record established by clear and convincing evidence that the change of permanency goal from reunification to adoption was proper. The court did not err or abuse its discretion when it changed the goal to adoption.

**Conclusion:**

For the aforementioned reasons, the court properly found that DHS met its statutory burden by clear and convincing evidence regarding termination of Father's and Mother's parental rights pursuant to 23 Pa.C.S.A. §2511(a) . . . (2). . . and (b) since it would best serve Child's emotional needs and welfare. The court also properly found that changing the Child's permanency goal from reunification to adoption was in Child's best interest. The trial court's termination of Father's and Mother's parental rights and change of goal to adoption were proper and should be affirmed.

Trial Court Opinion, 5/19 /17, at 15-17.

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation." *In re Z.P.,* 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where

direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

> A parent's abuse and neglect are likewise a relevant part of this analysis:
>
> > [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d 753, 763-64 (Pa. Super. 2008) (affirming the involuntary termination of the mother's parental rights, despite the existence of some bond, where placement with the mother would be contrary to the child's best interests, and any bond with the mother would be fairly attenuated when the child was separated from her, almost constantly, for four years). "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*,

856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted). It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d at 1007 (citing *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

As there is competent evidence in the record that supports the trial court's findings and credibility determinations, we find no abuse of the trial court's discretion in terminating Mother's and Father's parental rights to the Children under section 2511(b). *In re Adoption of S.P.*, 616 Pa. 309, 325-26, 47 A.3d 817, 826-27. We, therefore, affirm the termination decrees.

Next, we address whether there was sufficient evidence in the record to support the change in Child's permanency goal to adoption.[6] The Pennsylvania Supreme Court set forth our standard of review in a dependency case as follows.

---

[6] Although Mother waived any argument as to the goal change order, we will review the sufficiency of the evidence to support the order, since Father raised the issue, and goal change is not in regard to an individual parent. *See generally In re J.C.*, 5 A.3d 284, 289 (Pa. Super. 2010) (stating that dependency of a child is not determined "as to" one person, but rather must be based upon two findings by the trial court: whether the child is currently lacking proper care and control, and whether such care and control is immediately available). Further, we note that Mother's concise statement included the challenge to the goal change, so we will review the issue as part of our independent review of Mother's Counsel's motion to withdraw. *See Goodwin*, 928 A.2d at 291; *Wright*, 846 A.2d at 736; *Flowers*, 113 A.3d at 1250.

"The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." *In re R.J.T.*, 608 Pa. 9, [27], 9 A.3d 1179, 1190 (Pa. 2010). We review for abuse of discretion[.]

*In Interest of: L.Z.*, *A Minor Child*, 641 Pa. 343, 360, 111 A.3d 1164, 1174 (2015).

Regarding the disposition of a dependent child, section 6351(e), (f), (f.1), and (g) of the Juvenile Act provides the trial court with the criteria for its permanency plan for the subject child. Pursuant to those subsections of the Juvenile Act, the trial court is to determine the disposition that is best suited to the safety, protection and physical, mental and moral welfare of the child.

When considering a petition for goal change for a dependent child, the trial court considers:

> the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

*In re A.K.*, 936 A.2d 528, 533 (Pa. Super. 2007) (*citing* 42 Pa.C.S. § 6351(f)).

Additionally, Section 6351(f.1) requires the trial court to make a determination regarding the child's placement goal:

> **(f.1) Additional determination.—**Based upon the determinations made under subsection (f) and all relevant

evidence presented at the hearing, the court shall determine one of the following:

\*    \*    \*

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S. § 6351(f.1).

On the issue of a placement goal change, this Court has stated:

When a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. **See In re Sweeney**, 393 Pa. Super. 437, 574 A.2d 690, 691 (1990) (noting that "[o]nce a child is adjudicated dependent . . . the issues of custody and continuation of foster care are determined by the child's best interests"). Moreover, although preserving the unity of the family is a purpose of [the Juvenile Act], another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1.1). Indeed, "[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child." **In re E.F.V.**, 315 Pa. Super. 246, 461 A.2d 1263, 1267 (1983) (citation omitted).

**In re K.C.**, 903 A.2d 12, 14-15 (Pa. Super. 2006).

We find that there was sufficient evidence in the record to support the change of Child's permanency goal to adoption, for the reasons expressed by the trial court. **See** Trial Court Opinion, 5/19/17, at 15-17. We, therefore, affirm the goal change order.

Moreover, as we agree with Mother's Counsel that Mother's appeal is frivolous, and we cannot find any meritorious issues in the record, we grant Mother's Counsel's motion for leave to withdraw.

Decrees and order affirmed. Mother's Counsel's motion for leave to withdraw granted.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/31/2017